```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
```

| | |
|---|---|
| MELODEE KONRAD, as Guardian Ad Litem for Steven J. Konrad, | Case No. 13-CV-0228 (PJS/SER) |
| Plaintiff, | |
| v. | ORDER |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| Defendant. | |

Richard J. Nygaard, James S. Ballentine, and James R. Schwebel, SCHWEBEL GOETZ & SIEBEN, P.A., for plaintiff.

William D. Hittler, NILAN JOHNSON LEWIS P.A., for defendant.

Steven J. Konrad participated in an accidental-death-and-dismemberment insurance plan sponsored by his employer and established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Defendant Metropolitan Life Insurance Company ("MetLife") insures and administers the plan. Konrad's wife (in her capacity as Konrad's guardian ad litem) brought this action seeking review of MetLife's decision to deny Konrad's claim for benefits under the plan.

This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons explained below, MetLife's motion is granted, Konrad's motion is denied, and the complaint is dismissed with prejudice.

## I. FACTS

### A. Konrad's Injuries

In March 2010, Konrad was severely injured when the motorcycle that he was riding collided with a mattress that fell off a vehicle traveling ahead of him on an interstate highway. Compl. ¶ V.2 [ECF No. 1]. Konrad's injuries included head trauma, brain hemorrhage, respiratory failure, hypertension, acute blood loss, and fractures to his left clavicle, right radius, and hands. *See* ECF No. 1-6 at 11. Konrad was in a coma for approximately one month after the accident. *Id*. at 29.

Fortunately, Konrad has recovered from his injuries to a substantial extent. In a "Neuropsychological Consultation Report" prepared following an evaluation on February 9, 2011, psychologist David S. Alter noted that Konrad retained average or above-average levels of neurocognitive functioning in several areas. *See* ECF No. 14-1 at 26-27. Alter also reported that Konrad's condition had improved to the point that his daily routine included such tasks as making breakfast, playing computer games, and engaging in household chores. *Id*. at 25. Indeed, according to Alter, Konrad's "recovery has been remarkable in some ways given that he very easily could have died in the accident." *Id*. at 30.

Unfortunately, however, Konrad continues to struggle "with significant residual functional difficulties." *Id*. Among other impairments, Konrad "has suffered compromise to his intellectual abilities, shows markedly reduced speed of information processing and reduced motor speed, . . . [and] has a hard time focusing his attention under speeded conditions." *Id*. Moreover, according to Alter, "[i]t is likely that the majority of the spontaneous recovery [Konrad] is likely to experience has already occurred." *Id*. at 31. Due to these lingering

difficulties, Konrad is no longer employed in the same capacity as he was before the motorcycle accident, and it is unlikely that he will be able to hold a similar job in the future. *Id*. at 30.

### B. *The Plan*

Konrad was a participant in an employer-sponsored accidental-death-and-dismemberment insurance plan (the "Plan") established pursuant to ERISA. The Plan provides for the payment of lump-sum benefits should participants incur a "Covered Loss" such as loss of life, loss of sight, loss of hearing, paralysis, or "Brain Damage." ECF No. 14-3 at 31-32. "Brain Damage" is defined by the Plan as follows:

> *Brain Damage* means permanent and irreversible physical damage to the brain causing the complete inability to perform all the substantial and material functions and activities normal to everyday life. Such damage must manifest itself within 30 days of the accidental injury, require a hospitalization of at least 5 days and persists [sic] for 12 consecutive months after the date of the accidental injury.

*Id*. at 34.

The Plan gives MetLife the discretion to interpret the Plan's provisions and administer benefits. Specifically, the Plan provides as follows:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

*Id*. at 60.

### C. MetLife's Denial of Benefits

On April 18, 2011, Konrad's wife filed a claim on his behalf to recover benefits under the "Brain Damage" provision of the Plan. *See* ECF No. 14-1 at 2-9. Included in Konrad's submission was a statement from Dr. John Simon, Konrad's attending physician, who examined Konrad on April 8, 2011. *Id*. at 6-9. Among the questions asked of Dr. Simon in that document was whether Konrad had suffered injuries "causing the complete inability to perform all the substantial and material functions and activities normal to everyday life." *Id*. at 9. Dr. Simon checked "No," and wrote "[n]ot complete loss of function but significant and partial loss of function." *Id*. Konrad's wife later submitted various other documents to MetLife as part of the claims process, including the neuropsychological report from Alter described above. *Id*. at 23-32.

In a letter dated August 4, 2011, MetLife notified Konrad that it had denied his claim. *See* ECF No. 1-4. MetLife acknowledged that Konrad had suffered "permanent physical damage to [his] brain, which is not likely to significantly improve in the future." *Id*. at 2. MetLife pointed out, however, that the Plan's "Brain Damage" provision required not only that the claimant suffer "permanent and physical damage to the brain," but also that the claimant be "completely unable to perform all the substantial and material functions and activities normal to everyday life." *Id*. MetLife explained that, although Konrad did have some limitations as a result of his injury, he was "apparently able to take care of [his] everyday needs" while at home alone. *Id*. MetLife further explained that "[b]ased on you [sic] ability to remain home alone, you apparently are able to perform your activities of daily living without assistance and you are not considered to be unable to perform all the substantial and material functions and activities to [sic]

everyday life." *Id*. Accordingly, MetLife found that Konrad's injuries did not meet the Plan's definition of "Brain Damage."

Soon thereafter, Konrad appealed MetLife's denial of benefits to the MetLife Group Life Claim Appeal Committee. In a letter dated September 23, 2011, MetLife informed Konrad that the appeal had been denied. *See* ECF No. 1-5. MetLife explained that the "Brain Damage" provision was intended "for individuals following a traumatic brain injury that are not functioning at all. For example a profound or deep state of unconsciousness where an individual is unable to move or respond to their environment." *Id*. at 2. According to MetLife, the medical records provided by the Konrads indicated that Konrad retained "some functionality" and that his injuries had "not precluded [him] from performing all or even most of the material functions of normal life." *Id*. MetLife therefore upheld the denial of the claim for benefits.

Konrad's wife, acting as guardian ad litem for her husband, now brings this action seeking review of MetLife's denial of benefits.

## II. ANALYSIS

### *A. Summary Judgment*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

### B. Konrad's Claim of Benefits

#### 1. Standard of Review

As noted, the Plan grants MetLife discretionary authority to interpret the terms of the Plan and determine eligibility for benefits. ECF No. 14-3 at 60. When an ERISA plan grants such authority to the plan administrator, courts review the administrator's eligibility determinations for abuse of discretion. *See Darvell v. Life Ins. Co. of N. Am.*, 597 F.3d 929, 934 (8th Cir. 2010); *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 580 (8th Cir. 2008). Under that standard, an administrator's decision will be upheld if it was reasonable, and an administrator's decision will be deemed reasonable if the decision was supported by substantial evidence. *Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 925 (8th Cir. 2011). Substantial evidence means "more than a scintilla but less than a preponderance." *Govrik v. Unum Life Ins. Co. of Am.*, 702 F.3d 1103, 1109 (8th Cir. 2013) (quotation omitted).

MetLife insures and administers the Plan. When the administrator of an ERISA plan is also the insurer, the administrator has a conflict of interests that must be weighed in determining whether the administrator abused its discretion in denying a claim. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). The amount of weight given to the conflict depends on the circumstances of the particular case. *Id.* at 117. For example, where an insurer has a history of biased claims administration, the presence of a conflict may be given substantial weight. *Id.* But where the insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict may be given little weight. *Id.*

Under the abuse-of-discretion standard, the Court must defer to MetLife's interpretation of the Plan as long as it is "reasonable," even if the Court would interpret the language differently

as an original matter.  *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc).  To determine whether an administrator's interpretation is "reasonable," courts apply the five-factor test set forth in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992).  The *Finley* factors are:  (1) whether the administrator's interpretation is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation.  *Id*. at 621.  The Eighth Circuit has directed district courts to examine all five *Finley* factors.  *Lickteig v. Bus. Men's Assurance Co. of Am.*, 61 F.3d 579, 584 (8th Cir. 1995).

## 2.  MetLife's Interpretation of the Plan

The Plan defines "Brain Damage" as "permanent and irreversible physical damage to the brain causing the complete inability to perform all the substantial and material functions and activities normal to everyday life."  ECF No. 14-3 at 34.  MetLife interprets this provision as requiring the claimant to show that he is completely unable to perform *each and every one* (that is, *all*) of the "substantial and material functions and activities normal to everyday life."  In other words, if a claimant is able to perform even one of the "substantial and material functions and activities normal to everyday life," then he is not eligible for benefits.

Konrad conceded at the hearing on the parties' motions for summary judgment that he can indeed perform some of the "substantial and material functions and activities normal to everyday life" and thus that he is not eligible for benefits if MetLife's interpretation is found to

be reasonable. But, Konrad argues, MetLife's interpretation is not reasonable under the five *Finley* factors. The Court now turns to those factors.

3. The *Finley* Factors

*a. Contrary to Clear Plan Language*

The first *Finley* factor requires that the Court consider whether MetLife's interpretation of the "Brain Damage" provision is contrary to the clear language of the Plan. Konrad argues that it is. Konrad contends that, under the plain language of the "Brain Damage" provision, a claimant is eligible for benefits as long as the claimant is completely unable to perform at least *one* of "the substantial and material functions and activities normal to everyday life." If a claimant cannot perform even one such function or activity, Konrad argues, then the claimant cannot "perform *all* the substantial and material functions and activities normal to everyday life."

The Court finds that the "Brain Damage" provision is ambiguous, and that both MetLife's and Konrad's interpretations are consistent with the language of the Plan. The ambiguity arises because referring to a person as *not* being able to perform "all" of a group of functions can mean one of two things. To illustrate: Suppose that a judge asks her clerk to call the attorneys scheduled to appear before the judge the next morning to inform the attorneys that the hearing has been rescheduled. Suppose further that the clerk returns and tells the judge, "I was not able to reach all of the attorneys." The judge would probably understand the clerk to mean, "I was able to reach only *some* of the attorneys, and therefore I was unable to reach *all* of the attorneys." But the judge could conceivably understand the clerk to mean, "I was unable to reach *all* — that is, every single one — of the attorneys."

To recover under the "Brain Damage" provision, a claimant must establish that he has a "complete inability to perform all the substantial and material functions and activities normal to everyday life." ECF No. 14-3 at 34. The Court believes that this is most naturally read as MetLife reads it — that is, if a claimant *can* perform even one of the relevant functions, then the claimant is not completely unable to perform *all* of the relevant functions.[1] Konrad's reading — if a claimant *cannot* perform even one of the relevant functions, then the claimant is completely unable to perform *all* of the relevant functions — is also consistent with the language of the Plan. But Konrad's is not the only plausible reading of the provision, and MetLife's interpretation is likewise not contrary to the clear language of the Plan. The first *Finley* factor therefore weighs in favor of MetLife.

### b. Conflicts with ERISA

The second *Finley* factor requires that the Court consider whether MetLife's interpretation of the "Brain Damage" provision conflicts with the substantive or procedural requirements of ERISA. Konrad contends that MetLife's interpretation conflicts with the requirement that ERISA plans "be written in a manner calculated to be understood by the average

---

[1] The Court reaches this conclusion for three reasons. First, the "Brain Damage" provision requires that a claimant not only be *unable* to perform all of the substantial and material functions and activities normal to everyday life, but *completely* unable to perform all of those functions and activities. The use of the modifier "completely" is more consistent with MetLife's interpretation than with Konrad's. Second, a claimant suffering from "Brain Damage" is eligible to receive 100 percent of the lump-sum benefit under the Plan, whereas claimants suffering from other serious infirmities (such as loss of hearing and paralysis of both legs) receive partial benefits. *See* ECF No. 14-3 at 33. This suggests that the "Brain Damage" provision was meant to apply only to completely debilitating brain injuries. Third, when Konrad's doctor was asked whether Konrad had suffered injuries "causing the complete inability to perform all the substantial and material functions and activities normal to everyday life," he answered "No." ECF No. 14-1 at 9. In other words, Konrad's doctor interpreted the critical language precisely as MetLife does.

plan participant . . . ." 29 U.S.C. § 1022(a).  According to Konrad, MetLife misleads Plan participants by labeling the provision at issue in this case a "Brain Damage" benefit, when some claimants who suffer brain injuries will not qualify for the benefit.  Instead, says Konrad, "MetLife should have labeled the benefit *vegetative state benefit*," which (in Konrad's view) would more accurately describe the benefit.  ECF No. 19 at 8.

In essence, Konrad argues that when an ERISA plan labels something as a "Brain Damage" benefit, a typical participant will reach the conclusion — based solely on the two-word label — that the plan provides benefits to *any* participant who sustains *any* kind of brain damage. Konrad's position is not reasonable.  An average plan participant will understand that he must read more than labels — and, in particular, that he must read how a phrase that appears in a label is *defined* — before knowing what the plan covers.  As long as the plan as a whole — including the definitions used within the plan — is "written in a manner calculated to be understood by the average plan participant," the plan does not conflict with § 1022(a).

Konrad also argues that "MetLife's reading of its brain damage definition is simply not apparent to anyone other than the MetLife adjustor who made the decision to deny the claim." ECF No. 19 at 8 (emphasis omitted).  The Court disagrees.  As the Court has already explained, the Plan's definition of "Brain Damage" is ambiguous, and the interpretation of that ambiguity by "the MetLife adjustor who made the decision to deny the claim" is not only consistent with the language of the provision, but the most natural reading of the provision.  By requiring that plans be "written in a manner calculated to be understood by the average plan participant," ERISA does not prohibit the enforcement of reasonable interpretations of ambiguous terms.  *See, e.g.*, *Hankins v. Standard Ins. Co.*, 677 F.3d 830, 834-37 (8th Cir. 2012) (deferring to claims

administrator's interpretation of ambiguous phrase in plan established pursuant to ERISA); *Darvell*, 597 F.3d at 935-36 (same).

In short, Konrad has failed to show how the Plan is not "written in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a), or how the Plan otherwise conflicts with the substantive or procedural requirements of ERISA. The second *Finley* factor thus also weighs in favor of MetLife.

### c. Other Plan Language

The third *Finley* factor requires that the Court consider whether MetLife's interpretation renders any language in the Plan meaningless or internally inconsistent. Recall that "Brain Damage" is defined by the Plan as "permanent and irreversible physical damage to the brain causing the complete inability to perform all the substantial and material functions and activities normal to everyday life." ECF No. 14-3 at 34. Konrad contends that MetLife's interpretation renders the "permanent and irreversible physical damage" component of the definition meaningless, as many claimants (such as Konrad) will suffer permanent and irreversible brain injuries and yet not qualify for benefits under MetLife's interpretation.

Konrad's argument is plainly meritless. Insurance policies commonly require that multiple conditions be met before benefits are paid. To deny benefits because one of those conditions has not been met does not render the other conditions "meaningless." Under the "Brain Damage" provision, for example, a claimant must meet multiple conditions to be eligible for benefits. He must show, for example: (1) that he suffered "damage"; (2) that the damage was "physical"; (3) that the damage was "to the brain"; (4) that the damage is "permanent"; (5) that the damage is "irreversible"; and (6) that the damage has "caus[ed] the complete inability to

perform all the substantial and material functions and activities normal to everyday life." To deny "Brain Damage" benefits to a claimant who suffered damage to his leg instead of to his brain would not render any of these criteria "meaningless"; it would simply render some of them irrelevant to the particular benefits determination.

Under both MetLife's interpretation and Konrad's interpretation, a claimant must establish more than "permanent and irreversible physical damage to the brain" to recover benefits. MetLife says that the claimant must also establish that he is unable to perform each and every one of "the substantial and material functions and activities normal to everyday life"; Konrad says that the claimant must also establish that he is unable to perform at least one of "the substantial and material functions and activities normal to everyday life." Under both interpretations, then, a claimant must establish something more than "permanent and irreversible physical damage to the brain." And under neither interpretation is the requirement of "permanent and irreversible physical damage" rendered meaningless. The third *Finley* factor thus also weighs in favor of MetLife.

*d. Goals of the Plan*

The fourth *Finley* factor requires that the Court consider whether MetLife's interpretation is consistent with the goals of the Plan. Konrad's argument is simple. "The purpose of the brain damage benefit in MetLife's policy is to cover the risk of brain damage." ECF No. 19 at 5-6 (emphasis omitted). Konrad indisputably has suffered brain damage. "Just as life insurance . . . [is] designed to insure against the risk of death," says Konrad, "MetLife's brain damage benefit is designed to insure against the risk associated with brain injury or brain damage." *Id*. at 6 (emphasis omitted).

The flaw in Konrad's argument is obvious. Konrad starts from the premise that the "Brain Damage" provision is intended to provide benefits to any participant who suffers any damage to the brain, then complains that, under MetLife's interpretation, the "Brain Damage" provision would not meet this goal. But the "Brain Damage" provision is not intended to provide benefits to any participant who suffers any type of brain damage; that is clear from the face of the policy. Indeed, even under *Konrad's* interpretation of the provision it would not provide benefits to every single participant who suffered some type of brain damage.

Apart from this argument — an argument that is both circular and wrong — Konrad offers no other example of how MetLife's interpretation of the "Brain Damage" provision is contrary to the goals of the Plan. Accordingly, the fourth *Finley* factor also weighs in favor of Metlife.

*e. Consistency*

The fifth *Finley* factor requires that the Court consider whether MetLife has consistently followed its interpretation of the "Brain Damage" provision. Konrad argues that MetLife has been inconsistent in its representations about the meaning of the "Brain Damage" provision. In support of that argument, Konrad cites a letter sent by MetLife to Konrad shortly after his claim had been filed. That letter explains that the Plan

> provides a benefit for Brain Damage . . . if the following criteria are met:
>
> - The employee or dependent sustains an injury as a result of an accident, and
> - within 30 days of the accidental injury, brain damage materializes, and
> - the employee or dependent is hospitalized for a minimum of 5 days, and

- the brain damage persists for 12 consecutive months after the date of the injury.

ECF No. 1-6 at 24.  Konrad contends that this letter is inconsistent with MetLife's later interpretation of the Plan, as the "letter reveals no explanation whatsoever that MetLife would deny the claim unless Mr. Konrad was a vegetable."  ECF No. 17 at 13.

There is nothing inconsistent between this letter and MetLife's interpretation of "Brain Damage."  The Plan's "Brain Damage" provision consists of two components:  (1) a definition of "Brain Damage," and (2) a list of necessary conditions that a claimant who *has* suffered "Brain Damage" must satisfy in order to recover benefits.  The letter essentially addresses the second component — that is, the letter explains what conditions must be met by a claimant who has suffered "Brain Damage."  But the letter says nothing about what it means to suffer "Brain Damage" for purposes of the policy.  In short, because the letter does not discuss the meaning of "Brain Damage," nothing in the letter conflicts with MetLife's position as to the meaning of "Brain Damage."  Accordingly, like the first four *Finley* factors, the fifth *Finley* factor also weighs in favor of MetLife.

*f.  Other Factors*

Konrad argues that, notwithstanding the *Finley* analysis, the Court should nevertheless find that MetLife abused its discretion in denying Konrad's claim.

First, Konrad argues that MetLife abused its discretion by failing to ask Konrad to undergo an independent medical evaluation.  But *Konrad's own physician* answered "No" when asked whether Konrad had suffered injuries "causing the complete inability to perform all the substantial and material functions and activities normal to everyday life."  ECF No. 14-1 at 9.

Given that Konrad had the burden of establishing that he was entitled to benefits, and given that Konrad's own evidence showed that he was not entitled to benefits, MetLife did not abuse its discretion by failing to arrange an independent medical evaluation.

Second, Konrad argues that MetLife's failure to consider an "update letter" written by Alter on April 9, 2012 constitutes an abuse of discretion. The Court, however, must "consider only evidence that was before [the] administrator when [the] claim was denied." *Dorholt v. Hartford Life and Acc. Ins. Co.*, 244 Fed. Appx. 66, 68 (8th Cir. 2007) (per curiam). Alter provided his update letter over six months after Konrad's claim was denied. MetLife could not have abused its discretion in failing to consider evidence that was not before it when it made the decision now under review.

### C. Conclusion

For the reasons explained above, the Court finds that MetLife's interpretation of the "Brain Damage" provision is reasonable. As noted, Konrad concedes that, under MetLife's interpretation, he is not entitled to benefits. Accordingly, MetLife's motion for summary judgment is granted, and Konrad's motion for summary judgment is denied.

ORDER

Based on the following, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant Metropolitan Life Insurance Company's motion for summary judgment [ECF No. 11] is GRANTED.

2. Plaintiff Melodee Konrad's motion for summary judgment [ECF No. 15] is DENIED.

-15-

3. The complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 9, 2013        s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge